# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

SERENA JOHNSON,                                   Case No. 1:21-cv-02109

                                   Plaintiff,

      -vs-                                        JUDGE PAMELA A. BARKER


CUYAHOGA COUNTY JUVENILE              MEMORANDUM OPINION & ORDER
COURT CLERK'S OFFICE, et al.,

                                   Defendants.

Currently pending is Defendants Cuyahoga County Juvenile Court Clerk's Office (the "Clerk's Office"), Sarah Cigic, Sandra Spilker, and Kristin Carrino's (together, "Defendants") Motion for Summary Judgment ("Defendants' Motion").  (Doc. No. 33.)  Plaintiff Serena Johnson ("Plaintiff") did not file a brief in opposition to Defendants' Motion.

For the following reasons, Defendants' Motion for Summary Judgment is GRANTED.

## I.    Relevant Factual Background

The Clerk's Office hired Plaintiff as an Office Staff Manager on or around August 17, 2020.  (Doc. No. 1, ¶ 19.)  Plaintiff is African American.  (*Id.* at ¶ 17.)  As provided in the job description for the Office Staff Manager, Plaintiff was responsible for, among other things, "assist[ing] the Director in supervising and leading staff and the daily operations of the Clerk of Court's Office," "[c]oordinat[ing] and supervis[ing] the work for the Clerk of Court's Office Senior Supervisors and Fiscal Officer," and "[m]anag[ing] all personnel matters for the Clerk of Court's Office, including, but not limited to, interviewing and selection of staff . . . [and] mediating issues."  (Doc. No. 32-4.)  Plaintiff directly supervised the Clerk's Office's Senior Supervisors, and indirectly supervised the

Legal Service Clerks.  (Doc. No. 32-1, 66:4-67:8.)  In total, Plaintiff oversaw "a little more" than fifty (50) employees.  (*Id.* at 66:16-19.)

The Clerk's Office Employee Handbook in effect during Plaintiff's employment contained a policy regarding an "Introductory Period," which provided:

> **All newly hired, promoted, transferred and demoted employees will be required to successfully complete a 180-day Introductory Period.**  An employee may be terminated at any time during his or her Introductory Period upon written recommendation of the chain of command and as authorized by the Court Administrator.  Except for new hires, an employee may alternatively be removed from the position during the Introductory Period and returned to his or her previous position, at the discretion of the Court Administrator, unless the previous position is not available.  Terminations and removals during the Introductory Period cannot be appealed.
>
> An employee will receive two Performance Evaluations during his or her Introductory Period. Human Resources will send out notices for the Performance Evaluation Forms to be completed prior to the 90th day and 180th day of the Introductory Period. Supervisors are responsible for completing the Performance Evaluation Form. Supervisors will sign the Performance Evaluation Form and forward it through the chain of command, up to the Department Director, for signature.  Supervisors will then conduct a conference with the employee and obtain the employee's signature on the Performance Evaluation Form.  It is the responsibility of the supervisor to provide copies to the employee and the chain of command and to forward the original Performance Evaluation to Human Resources for the employee's personnel file.
>
> The Performance Evaluations will include factor ratings for areas of achievement and areas needing improvement.  When an employee's performance does not meet minimum performance expectations, the supervisor will submit a Performance Improvement Plan.  **An employee's Introductory Period may be extended upon written recommendation of the chain of command and the approval of the Court Administrator.**
>
> Successful completion of the Introductory Period garners no enhanced employment status and in no way modifies the employee's status of being unclassified, at-will, and employed at the pleasure of the Administrative Judge.

(Emphasis added)  (Doc. No. 33-1 at Ex. 1).

At the time of Plaintiff's hiring, her direct supervisor was Director of the Clerk of Courts Linda Brooks.  (Doc. No. 1, ¶ 20.)  Brooks is African American.  (*Id.* at ¶ 21.)  Brooks later retired, and on approximately December 1, 2020, Defendant Sarah Cigic became Plaintiff's direct supervisor. (*Id.* at ¶¶ 22-23; Doc. No. 33-2, ¶ 4.)  Cigic is Caucasian.  (Doc. No. 1, ¶ 25.)

Once Cigic familiarized herself with the day-to-day operations of the Clerk's Office, she "made a number of minor changes to the organization of the Clerk's Office."  (Doc. No. 33-2, ¶ 8.) Cigic informed Plaintiff of these changes on January 8, 2021.  (*Id.*)  Among those changes, Cigic assigned Plaintiff to undertake direct supervision of certain clerks who had previously been reassigned to Training Manager Anne Purdy while the Senior Supervisor role that traditionally supervised those clerks was vacant.  (*Id.* at ¶¶ 7, 9.)  Cigic made this change because the "supervision and leading [of the] Clerk's Office staff was more directly aligned with [Plaintiff's] job duties," and because Cigic wanted to eliminate supervisor duties for Purdy so that Purdy could focus on her newly formed role in "developing, coordinating, and implementing introductory training for newly hired Clerk's Office employees."  (*Id.* at ¶ 9.)  Cigic also assigned four Case Management Clerks to directly report to Plaintiff because they were previously "floating" clerks who were "not dedicated to a particular magistrate [judge], and [Plaintiff] would be able to ensure they were assigned tasks fairly and equally throughout the Clerk's Office."  (*Id.* at ¶ 11.)  Lastly, on January 8, 2021, Cigic assigned Plaintiff to participate as an interviewer on the interview panels for a new Case Management Clerk, Senior Supervisor, and Lead Clerk.  (*Id.* at ¶ 12, Ex. 1.)  Cigic did not assign Plaintiff to participate as an interviewer during the hiring "palooza" for new Legal Services Clerks, as that event involved "multiple hiring panels conducting interviews back-to-back all day, and [Plaintiff] was needed to

3

supervise the entire Clerk's Office while all Senior Supervisors were included on the panels." (*Id.* at ¶¶ 12-13, Ex. 1.)

Cigic declares that, during her time as Plaintiff's supervisor, she received multiple complaints regarding Plaintiff's treatment of Clerk's Office staff. (*Id.* at ¶ 15.) On or about December 17, 2020, Cigic received a complaint from employee Jacqueline Palmer regarding Plaintiff. (*Id.* at ¶ 16.) Palmer complained of Plaintiff's "offensive and aggressive" tone during an interaction in which Plaintiff assigned work to Palmer. (*Id.* at ¶ 17, Ex. 2.) Cigic reviewed Palmer's complaint, interviewed both Palmer and Plaintiff, and "determined that the issue was likely a misunderstanding based on poor communication." (*Id.* at ¶ 18, Ex. 2.) Cigic then provided a memorandum detailing her findings to Palmer and Plaintiff. (*Id.* at ¶ 19, Ex. 3.)

Cigic declares that in December of 2020, she "received multiple anonymous complaints from Clerk's Office employees, who were concerned with [Plaintiff's] demeanor and treatment of Clerk's Office staff." (*Id.* at ¶ 22.) Specifically, on December 4, 2020, Cigic received an anonymous complaint stating that the Clerk's Office employees were "not sure what [Plaintiff's] job actually is, other than [to] mak[e] our lives miserable." (*Id.* at ¶ 23, Ex. 4.) On December 21, 2020, Cigic received another anonymous complaint stating that Plaintiff exhibited "an overly aggressive 'bullying mentality'; that her tone with Clerk's Office staff was 'highly offensive and disrespectful'; and that she displayed 'extremely off-putting, aggressive, and defensive' body language around staff." (*Id.* at ¶ 24, Ex. 5.) "The author believed that '[Plaintiff's] body language, tone and bullying nature w[ould] lead to an altercation with the clerks in the office.'" (*Id.*) Cigic received a third anonymous complaint on December 24, 2020 "raising the same concerns and also claiming that morale was so low that Clerk's Office employees were seeking new employment." (*Id.* at ¶ 25, Ex. 6.) Cigic is also aware

4

of one other formal complaint made against Plaintiff by Clerk's Office employee Sharon Walker in November 2020.  (*Id.* at ¶ 27.)

According to Cigic, in her direct observations of Plaintiff, she "observed that she employed an extremely regimented, almost militaristic managerial style," that proved "unworkable."  (*Id.* at ¶ 28.)  Cigic declares that the complaints against Plaintiff "could have justified terminating [Plaintiff's] employment during her initial-180 Introductory Period," but Cigic "instead attempted to verbally coach [Plaintiff] and improve her communication with Clerk's Office staff."  (*Id.* at ¶ 29.)  Cigic conducted multiple meetings with Plaintiff regarding "the complaints against her, morale in the Clerk's Office generally, and other day-to-day issues in the Clerk's Office."  (*Id.* at ¶ 30.)  Cigic declares that Plaintiff's "general response to the complaints was to blame others and refuse to take accountability."  (*Id.*)  Cigic also suggested she and Plaintiff "work through a book on leadership together."  (*Id.* at ¶ 32.)

Due to Cigic's other duties as Deputy Court Administrator/Chief Legal Counsel, she "had very little opportunity to directly supervise [Plaintiff's] work, and because of the Director vacancy, [Plaintiff] did not receive a performance evaluation during her initial 180-day Introductory Period."  (*Id.* at ¶ 32.)  Thus, because of the Director vacancy and the multiple complaints against Plaintiff, Cigic submitted to Court Administrator Terease Neff, a memorandum recommending that Plaintiff's Introductory Period be extended for a period of four months, from February 17, 2021 to June 17, 2021.  (*Id.* at ¶¶ 33-34, Ex. 9.)  According to Cigic, this extension would allow the incoming Director, Je'Nine Nickerson, a chance to evaluate Plaintiff's performance.  (*Id.* at ¶ 33.)   Neff approved the extension and granted Cigic permission to sign the approval on her behalf.  (*Id.* at ¶ 34.)

On or about February 16, 2021, Senior Human Resources Manager Kristin Carrino notified Plaintiff that her Introductory Period was extended for a period of four months via email.  (Doc. No. 33-3, ¶¶ 5-6, Ex. 1.)  On February 18, 2021, Plaintiff emailed nonparty employee Michelle Oszterling, Neff, Cigic, Human Resources Director Sandy Spilker, and Carrino asking for a "written explanation of why the Introductory Period is being extended."  (Doc. No. 33-2, Ex. 10.)  Later that day, Cigic met with Plaintiff and told her that her Introductory Period was being extended because "she had not yet received a performance evaluation, that [Cigic] had only had a brief time to supervise her directly, and that the new Director would be starting soon and would need time to work with her."  (Doc. No. 33-2, ¶ 38.)

On February 19, 2021, Carrino contacted Plaintiff to set up a meeting to discuss the reasons her Introductory Period was being extended.  (Doc. No. 33-3, ¶ 7.)  Later that day, Plaintiff, Spilker, and Carrino met in-person.  (*Id.*)  During that meeting, Plaintiff "presented a written statement complaining about perceived changes to her role as Office Staff manager, as well as her opinion on the work performance of Training Manager Anne Purdy."  (*Id.* at ¶ 8; Doc. No. 33-1, ¶ 12, Ex. 3.)  In that statement, Plaintiff wrote that "[o]ver the last 3 months with Juvenile Court, [she has] received unfair and disparate treatment in the position of the Clerk's Office Staff Manager."  (Doc. No. 33-1, Ex. 3.)  Plaintiff's statement then details the issues that she had experienced—chiefly that major changes had occurred in the Clerk's Office that had "stripped away" Plaintiff's job duties and negatively impacted her ability to perform.  (*Id.*)  Plaintiff's statement provides the following examples of her duties being "stripped away": (1) she was informed on January 7, 2020 that she could not be a part of the interview process for eight Legal Service Clerks; (2) on January 6, 2021, she was required to purchase and read a leadership book with Cigic "without a clear explanation as to why,"

which Plaintiff perceived to be an "unwarranted reprimand and unfair due to the 'open door policy' in place," a policy which Plaintiff stated "caused employees to build barriers with [her] and circumvent the relationship [they] should be building together"; (3) on January 8, 2021, four Case Management Clerks were transferred to her supervision and since December 2020, three Senior Supervisors have been out of the office on extended leave, which left only Plaintiff to cover one to two units simultaneously which was "very time consuming"; (4) on January 8, 2021, Purdy's supervisory responsibilities were transferred to Plaintiff, while training, which Purdy was responsible for, had been nonexistent in the office, yet Purdy's Introductory Period was not extended while Plaintiff's Introductory Period was in fact extended.  (*Id.*)  Plaintiff ends the statement with: "Why am I being treated differently?"  (*Id.*)

According to Spilker and Carrino, during the meeting with Plaintiff, they discussed how Plaintiff "could improve in the performance of her duties as Clerk's Office Staff Manager going forward."  (Doc. No. 33-3, ¶ 10; Doc. No. 33-1, ¶ 14.)  Spilker and Carrino suggested Plaintiff "focus on her performance, and not the performance of Purdy, an employee over whom [Plaintiff] had no direct supervision."  (Doc. No. 33-3, ¶ 10; Doc. No. 33-1, ¶ 14.)  Spilker and Carrino both declare that Plaintiff did not make a complaint of race discrimination at any time during the meeting, nor in her written statement.  (Doc. No. 33-3, ¶ 11; Doc. No. 33-1, ¶¶ 14-15.)  Carrino "did not believe [Plaintiff] to be making a complaint of race discrimination."  (Doc. No. 33-3, ¶ 12.)  Had Plaintiff made a complaint of race discrimination, or any other type of discrimination, Spilker and Carrino aver that they would have had Plaintiff fill out an internal human resources complaint form.  (Doc. No. 33-3, ¶ 13; Doc. No. 33-1, ¶ 16.)  Because Plaintiff did not make such a complaint, Spilker "did not direct any Human Resources employee to conduct an investigation."  (Doc. No. 33-1, ¶ 17.)

7

In her deposition, Plaintiff states that two portions of her written statement mention racial discrimination: (1) her reference to "disparate treatment," which means being treated differently "[f]rom a person of a non-protected class," thus it "mentions race"; and (2) her question asking why she was being treated differently.  (Doc. No. 32 at 238:25-244:12.)  However, Plaintiff conceded that her statement does not "mention the word race."  (*Id.* at 238:25-39:3.)  Plaintiff also testified that she did not have to say in her written statement that she received unfair and disparate treatment because she is black and Purdy is white.  (*Id.* at 241:24-42:21.)  When asked what she said to Spilker and Carrino during their meeting, Plaintiff testified as follows:

> I can't remember everything I told them, but I sat down and told them that I felt like I'm being treated definitely [sic] than Anne [Purdy] because she's white and I am black.  We're the only two managers in the clerk's office that report to Sarah Cigic. She don't treat Anne the same way.  I have complained about this over and over, and now Anne -- again, her -- she didn't extend Anne's -- she didn't extend her probationary period.  Sarah never worked with Anne -- not she never worked with Anne, but Sarah Cigic never worked inside the clerk's office.  She don't [sic] know if Anne was doing her job or not.  She didn't care.  I complain about disparate treatment because Anne gets preferential treatment because I'm black.  And they replaced me with a white man, so apparently I'm right.

(*Id.* at 243:21-44:12.)

On March 15, 2021, Je'Nine Nickerson was hired as the Director of the Clerk of Court and became Plaintiff's direct supervisor.  (Doc. No. 33-4, ¶¶ 3-4.)  Upon Nickerson's arrival, she conducted one-on-one meetings with each staff member of the Clerk's Office.  (*Id.* at ¶ 5.)  According to Nickerson, "[d]uring those meetings, many employees expressed concerns about [Plaintiff's] demeanor and treatment of staff," and "[s]ome employees were under the impression that they were being targeted for termination."  (*Id.* at ¶ 6.)  Nickerson also "witnessed [Plaintiff's] behavior towards Clerk's Office staff directly and the manner in which she not only addressed staff but spoke of staff." (*Id.* at ¶ 7.)  Nickerson "was also made aware of multiple written complaints against [Plaintiff] which

8

indicated to [her] that [Plaintiff's] behavior was an ongoing issue" and Nickerson "was very concerned that an employee who was still on her Introductory Period would be the cause of so much interoffice conflict." (*Id.* at ¶¶ 8-9.)  Nickerson declares that Plaintiff's "behavior towards staff took its toll on morale in the Clerk's Office," and "[d]espite [Nickerson's] efforts to provide coaching to [Plaintiff] to improve her communication skills and interactions with staff, she did not improve in this aspect of the Staff Manager position." (*Id.* at ¶ 10.)  On June 3, 2021, Nickerson expressed these concerns in a memorandum recommending that Johnson be terminated.  (*Id.* at ¶ 11, Ex. 1.)  According to Nickerson: "The decision to recommend [Plaintiff's] termination was made solely by [her] based on the performance issues [she] witnessed directly, one-on-one meetings with Clerk's Office employees, other employee complaints, and [Plaintiff's] inability to correct and improve her communications with staff, despite [her] attempts to coach her." (*Id.* at ¶ 13.)

Based on Nickerson's recommendation, Cigic, as Deputy Court Administrator/Chief Legal Counsel, approved Nickerson's recommendation for Plaintiff's termination.  (Doc. No. 33-2, ¶ 41.)  According to Cigic, the recommendation was also approved by Court Administrator Neff.  (*Id.* at ¶ 42.)  Had Neff not approved the recommendation, Plaintiff could not have been terminated.  (*Id.*)

## II.  Procedural History

Plaintiff filed a Complaint, *pro se*, in this Court on November 8, 2021 alleging four causes of action.  (Doc. No. 1.)  Plaintiff's first three causes of action are asserted against the Clerk's Office only: (1) race discrimination in violation of Title VII (Count I); (2) retaliatory discrimination in violation of Title VII (Count II); and (3) race discrimination in violation of Ohio Revised Code § 4112.02(A) (Count III).  Plaintiff's fourth cause of action is asserted against all Defendants: (4) retaliatory discrimination in violation of Ohio Revised Code § 4112.02(I).   On December 2, 2022,

Defendants filed the instant Motion for Summary Judgment.  (Doc. No. 33.)  Plaintiff did not file an opposition.  Thus, Defendants' Motion is now ripe for a decision.

### III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party."  *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).  "Thus, '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'"  *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (alteration in original).  A fact is "material . . . only if its resolution might affect the outcome of the suit under the governing substantive law."  *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party."  *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018).  In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact."  *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014).  The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact."  *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008).  "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may [also] meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's

case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 F. App'x at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV.  Analysis

### A.  Claims against the Clerk's Office

Defendants first argue that Plaintiff's claims against the Clerk's Office fail as a matter of law because the Clerk's Office is not a legal entity capable of being sued. (Doc. No. 33 at 6.)

The Supreme Court of Ohio has held that Ohio courts are not *sui juris*, or in other words, are entities incapable of suing or being sued. *Burton v. Hamilton Cty. Juvenile Court*, 2006 WL 91600, at *5 (S.D. Ohio Jan. 11, 2006) (citing *Malone v. Court of Common Pleas of Cuyahoga Cty.*, 344 N.E.2d 126 (1976)); *see also Black v. Montgomery Cty. Common Pleas Court*, 2018 WL 2473560, at *1 (S.D. Ohio June 4, 2018) (holding that the Montgomery County Common Pleas Court is not *sui juris*). Because the Clerk's Office is simply an administrative unit of the county court, it too is not *sui juris*. *See e.g.*, *Elkins v. Summit Cty., Ohio*, 2008 WL 622038, at *6 (N.D. Ohio Mar. 5, 2008) ("Administrative units of a local government . . . are not *sui juris* because they lack the power to sue, and cannot be sued absent positive statutory authority."); *see also McKnight v. Cuyahoga Cty. Justice Sys. Ctr.*, 2021 WL 5180128, at *1 (N.D. Ohio Nov. 8, 2021) (finding the Cuyahoga County Justice System Center incapable of being sued); *Lenard v. City of Cleveland*, 2017 WL 2832903, at *2-3 (N.D. Ohio, 2017) (holding that a county prosecutor's office is a sub-unit of a county government

and is not itself *sui juris*); *Jackson v. Adult Parole Auth.*, 2020 WL 639187, at *2 (N.D. Ohio Feb. 11, 2020) (holding that the Cuyahoga County Jail, the Cuyahoga County Sheriff's Office, and the Cuyahoga County Common Pleas Court are not *sui juris*); *see also Carmichael v. City of Cleveland*, 571 F. App'x 426, 435 (6th Cir. 2014) ("[U]nder Ohio law, a county sheriff's office is not a legal entity that is capable of being sued.") (collecting cases).

Accordingly, the Court finds the Clerk's Office incapable of being sued. The Court GRANTS Defendants' Motion for Summary Judgment as to all claims against the Clerk's Office, which includes Counts I through III of Plaintiff's Complaint in their entirety and Count IV as against the Clerk's Office.

### B. Retaliation claim

All that remains for the Court's evaluation is Count IV as against Defendants Cigic, Carrino, and Spilker. Count IV alleges retaliatory discrimination in violation of Ohio Revised Code § 4112.02(I). (Doc. No. 1 at 12.)

While not argued by Defendants, pursuant to 28 U.S.C. § 1367(c)(3), district courts may decline to exercise supplemental jurisdiction over state law claims once they have dismissed all claims over which they had original jurisdiction. In determining whether to retain jurisdiction over Plaintiff's state-law claims, "a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.'" *Basista Holdings, LLC v. Ellsworth Twp.*, 710 F. App'x 688, 693 (6th Cir. 2017) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). A district court should balance the interests of judicial economy and avoidance of multiplicity of litigation against "needlessly deciding state law issues." *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 211 (6th Cir. 2004).

12

In *Taylor v. First of Am. Bank-Wayne*, the Sixth Circuit affirmed a district court's decision to retain supplemental jurisdiction over remaining state law claims because "the interests of judicial economy and fairness both favored the district court's retention of jurisdiction."  973 F.2d 1284, 1288 (6th Cir. 1992).  The Sixth Circuit noted that the case had been on the district court's docket for nearly two years and that the parties had completed discovery and compiled a "voluminous record."  *Id.*  The Sixth Circuit further noted that an extensively briefed summary judgment motion was ripe for a ruling by the district court and any remand could have "wasted judicial resources and resulted in additional delay."  *Id.*  Therefore, the court concluded that the district court did not abuse its discretion in denying the plaintiffs' motion to remand.  *Id.*

Likewise, in *Harper*, the Sixth Circuit affirmed a district court's decision to retain supplemental jurisdiction over remaining state law claims.  *Harper*, 392 F.3d at 211.  The Sixth Circuit noted that the case had been on the district court's docket for nearly a year, discovery was complete, and the defendants' summary judgment motions were ripe for a decision.  *Id.*

The Court concludes that multiple factors weigh in favor of exercising supplemental jurisdiction over Plaintiff's remaining state law claim against Defendants Cigic, Carrino, and Spilker.  First, this case has been pending in this Court since November 8, 2021.  (Doc. No. 1.)  Second, discovery is complete in this matter and Defendants' Motion for Summary Judgment substantively addresses Plaintiff's state law claim.  (Doc. No. 33.)  Third, the analysis for analyzing federal law claims under Title VII and the Ohio state law claims under the Ohio Civil Rights Act is the same.  *See Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008); *see also Lindsey*, 295 F. App'x at 760 n.1 ("The Ohio Civil Rights Act mirrors Title VII in all relevant respects for Plaintiff's discrimination and retaliation claims.").  Thus, the Court concludes that the instant case is one "where

13

the interests of judicial economy and the avoidance of multiplicity of litigation outweigh our concern over needlessly deciding state law issues."  *Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 584 (6th Cir. 2011) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)).

In Count IV, Plaintiff claims that she complained about the race discrimination she was experiencing, and subsequent to that complaint, Plaintiff was "assigned additional work duties from her white co-workers" and her "employment was terminated without cause."  (Doc. No. 1, ¶¶ 146-148.)  Plaintiff claims that these actions "were retaliatory in nature based on [Plaintiff's] opposition to the unlawful discriminatory conduct," in violation of Ohio law.  (*Id.* at ¶¶ 149-150.)

Defendants argue that Plaintiff cannot make a prima face case of retaliation because: (1) Plaintiff did not engage in protected activity; (2) Plaintiff cannot show that the County was aware of any protected activity; (3) Plaintiff cannot establish a materially adverse action occurred after her alleged protected activity; (4) Plaintiff cannot establish that her termination was causally connected to her alleged protected activity; and (5) the County has legitimate, non-discriminatory reasons for Plaintiff's termination.[1]  (Doc. No. 33.)  Further, Defendants argue that there is no evidence of pretext. (*Id.*)

Ohio Rev. Code § 4112.02 provides in relevant part as follows:

It shall be an unlawful discriminatory practice:

. . .

(I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or

---

[1] While Defendants "do not dispute that [Plaintiff] can make a prima facie case for discrimination regarding her termination," Plaintiff's claims of race discrimination (Counts I and III) were only asserted against the Clerk's Office, which the Court has held is incapable of being sued.  Thus, the Court will not address Defendants' arguments related to Plaintiff's discrimination claims herein.

14

> because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

Ohio Rev. Code. § 4112.02(I).  Because this provision "mirrors Title VII in all relevant respects for Plaintiff's [] retaliation claims," the Court will reference both federal and state law in analyzing Plaintiff's claim of retaliation.  S*ee Lindsey*, 295 F. App'x at 760 n.1; 42 U.S.C. § 2000e-3; Ohio Rev. Code § 4112.02.

A plaintiff may rely on either direct or circumstantial evidence to establish that an employer engaged in retaliation.  *Daniels v. Pike Cty. Comm'rs*, 706 F. App'x 281, 291 (6th Cir. 2017).  Here, Plaintiff has not offered any direct evidence in support of her retaliation claim.  Consequently, the *McDonnell Douglas* burden-shifting framework applies.  *See Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013).  "Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation."  *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 582 (6th Cir. 2014).  "If the plaintiff succeeds in making out the elements of a prima facie case, the burden of production shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions."  *Id.*  Finally, "[i]f the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate that the defendants' proffered reason was not the true reason for the employment decision."  *Id.*

To establish a prima facie case of retaliation, the plaintiff must demonstrate that: (1) she engaged in protected activity; (2) Defendants knew of her protected activity; (3) thereafter, the Defendants took "materially adverse" actions against her; and (4) "the protected conduct was a but-for cause of the adverse action."  *Id.*

15

### 1.     Protected activity

With respect to the first element, "[w]hile a plaintiff need not file a formal charge of discrimination with the EEOC in order to engage in statutorily protected activity for purposes of Title VII, an employee may not invoke the protections of the statute merely 'by making a vague charge of discrimination.'"  *Weltman v. Panetta*, 2012 WL 4955286, at *5 (N.D. Ohio Oct. 16, 2012) (quoting *Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 591 (6th Cir. 2007)).  "Rather, the employee must specifically make a complaint of an 'unlawful' employment practice."  *Id.* (granting summary judgment with respect to plaintiff's retaliation claim because "[h]e never told Gibson or any of Gibson's supervisors that he thought Gibson's practice was unlawful or violated his rights under Title VII").[2]  Complaints regarding an employer's "management practices" are not protected activity if such complaints are not regarding an employer's unlawful activity, such as race discrimination.  *See Caldwell v. Gasper*, 2022 WL 16629161, at *7 (6th Cir. Nov. 1, 2022).

For example, in *Booker v. Brown & Williamson Tobacco Co., Inc.*, after his employer already began proceedings to demote him, the plaintiff sent a letter to his employer's human resources department alleging that his supervisor made a racist statement, and that recent criticism of the plaintiff's job performance was a "case of ethnocism."  879 F.2d 1304, 1309 (6th Cir. 1989).  In that case, the Sixth Circuit held that the allegation of "ethnocism" was too vague to invoke the protections of Title VII.  *Id.* at 1313.  The court also found that the plaintiff's complaint regarding his supervisor's racist statement did not allege that the defendant was "engaging in [an] unlawful employment practice, but that one of its employees has a racial intolerance," and therefore was not protected.  *Id.*; *see also Addison v. Servs. to Enhance Potential, W. Wayne*, 2018 WL 7048462, at *4 (E.D. Mich.

---

[2] However, the plaintiff need only have "a reasonable and good faith belief that the opposed practices were unlawful." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).

Nov. 27, 2018) ("Addison's complaint is not that STEP engaged in an unlawful employment practice, which he opposed, but that McGuire was inappropriate and rude to him because of his race.  He does not explain how McGuire's actions violated Title VII.  Accordingly, his threat to report her conduct was not protected activity under the opposition clause.").  The Sixth Circuit "found that the gravamen of the letter to human resources was a complaint about management practices, rather than one of racial discrimination." *Trujillo v. Henniges Automotive Sealing Sys. N. Am., Inc.*, 495 F. App'x 651, 655 (6th Cir. 2012) (referring to the court's decision in *Booker*, 879 F.2d at 1313).

This Court has likewise held that a plaintiff failed to establish that she engaged in protected activity when she complained that she had issues "as an African-American female being hired as a plumber but being asked to do job-related duties that were not addressed during the job interview." *Hatcher v. Cuyahoga Metro. Hous. Auth.*, 2022 WL 2116965, at *11 (N.D. Ohio June 13, 2022). This Court determined that the plaintiff never complained that her employer "was engaged in an unlawful employment practice by asking a Black woman to periodically assist in picking up trash and/or removing snow as part of her job duties." *Id.*  The Court determined that there was no evidence that the plaintiff's employer based its request that the plaintiff sometimes pick up trash and/or remove snow on the plaintiff's race. *Id.*

Further, this Court determined that the plaintiff's one complaint to her employer "that invoked her race," "combined with a repeated complaint about the correctness of [her employer's] decision to require [her] to sometimes pick up trash and/or collect snow, is not a specific complaint about discrimination." *Id.*; s*ee also, e.g.*, *Nasrallah v. Robert Half Int'l*, 2020 WL 1862657, at *10 (N.D. Ohio Apr. 14, 2020) (concluding that the plaintiff's objection to and correction of a coworker's

17

statements regarding Arabs was not a specific complaint that the coworker had discriminated against the plaintiff or had otherwise engaged in any other unlawful employment practice).

Here, the Court will analyze whether either Plaintiff's alleged verbal statement and/or written statement to Spilker and Carrino constitutes protected activity.  As to Plaintiff's written statement, Defendants argue that the statement does not allege race discrimination, but rather lists "ordinary grievances about Cigic's management decisions."  (Doc. No. 33 at 11.)  The Court agrees with Defendants and holds that Plaintiff's written statement is not protected activity.  In Plaintiff's written statement, her reference to "disparate treatment," without any reference to her race, is too vague of an allegation to be considered an allegation of racial discrimination.  *See Booker*, 879 F.2d at 1212. Further, Plaintiff's question as to why she was being treated differently is also too vague to be considered an allegation of racial discrimination.  An allegation of differential treatment is not enough to constitute a charge of discrimination.  *See Caldwell*, 2022 WL 16629161, at *7.  Rather, Plaintiff's written statement is merely a complaint regarding management decisions, not a statement alleging unlawful activity by her employer.

As to Plaintiff's verbal statement, Defendants do not address Plaintiff's deposition testimony that she told Spilker and Carrino during their meeting on February 19, 2021, that she felt like she was being treated differently because she was black and Purdy was white.  (Doc. No. 32 at 243:21-44:12.) Specifically, Plaintiff testified: "I sat down and told them that I felt like I'm being treated definitely [sic] than Anne [Purdy] because she's white and I am black. . . . She don't treat Anne the same way. I have complained about this over and over, and now Anne -- again, her -- she didn't extend Anne's -- she didn't extend her probationary period. . . . I complain about disparate treatment because Anne

gets preferential treatment because I'm black."  (*Id.*)  According to Spilker and Carrino, Plaintiff did not mention race in the meeting.  (Doc. No. 33-3, ¶ 11; Doc. No. 33-1, ¶¶ 14-15.)

Construing these facts in Plaintiff's favor, however, and without argument from Defendants, there appears to be "two reasonable ways to read the record."  *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 647 (6th Cir. 2015). Plaintiff's verbal complaint could reasonably be construed as "'contesting the correctness of a decision made by [Plaintiff's] employer,' rather than asserting discrimination."  *Willoughby v. Allstate Ins. Co.*, 104 Fed. App'x 528, 531 (6th Cir. 2004) (quoting *Booker*, 879 F.2d at 1313).  Plaintiff's complaint could, however, also be reasonably construed as a "charge of discrimination."  *See Yazdian.*, 793 F.3d at 647.  In such a case, a reasonable jury could conclude that Plaintiff's verbal statement to Spilker and Carrino constitutes protected activity.

### 2.    Causation

The Court will next turn to Defendants' argument that Plaintiff's termination was not causally connected to any alleged protected activity as this issue is dispositive.  Defendants argue that because Plaintiff was fired approximately four months after her Introductory Period was extended, "[t]his timeframe is insufficient to support an inference that there was a causal link between her alleged protected activity and her termination."  (Doc. No. 33 at 15.)  Defendants argue that Plaintiff is also unable to establish a causal connection between her termination and any protected activity because problems existed regarding Plaintiff's treatment of staff prior to her alleged complaint regarding race discrimination.  (*Id.*)

Plaintiff is required to show that a causal connection between the protected activity and the adverse employment action exists.  *See Mys v. Mich. Dept. of State Police*, 886 F.3d 591, 600 (6th

Cir. 2018). This element requires proof of so-called "but-for" causation, meaning that the plaintiff must furnish evidence that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). The proximity in time between the protected activity and an adverse employment action may give rise to an inference of a causal connection. *See Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987).

The Court determines that Plaintiff has failed to make the requisite showing of a causal connection. Plaintiff alleges that she made her verbal race discrimination complaint on February 19, 2021, and she was later fired on June 4, 2021, approximately four months later. As the Sixth Circuit has held, "[t]he mere fact that [Plaintiff] was discharged four months after filing a discrimination claim is insufficient to support an interference [sic] of retaliation." *Cooper v. City of N. Olmstead*, 795 F.2d 1265, 1272-73 (6th Cir. 1986). Plaintiff has provided no further evidence of causation, and without more, Plaintiff is unable to establish a causal connection between her termination and her protected activity.[3]

Moreover, even if the proximity in time could give rise to an inference of a causal connection here, "the paper trail of criticisms that ultimately led to [Plaintiff's] firing began before" the alleged protected activity occurred. *See Cox. v. Science Applications Int'l Corp.*, 2000 WL 977309, at *3 (6th Cir. July 6, 2000). Here, Cigic received numerous documented complaints regarding Plaintiff's treatment of staff before Plaintiff complained of race discrimination. Thus, Plaintiff has failed to

---

[3] To the extent Plaintiff claims that subsequent to her racial discrimination complaint, she was "assigned additional work duties from her white co-workers" (Doc. No. 1, ¶ 147), no evidence to support such a claim exists. Rather, these assignments all took place prior to Plaintiff's alleged verbal complaint.

establish a causal connection between the alleged protected activity and the adverse employment action.  Plaintiff has failed to make out a prima facie case of retaliation.

### 3.    Legitimate, Non-Discriminatory Reason and Pretext

Even if the Court assumed that Plaintiff *could* establish a prima facie case of retaliation, the Court nevertheless concludes that Plaintiff fails to demonstrate that Defendants' proffered legitimate, nondiscriminatory reason for terminating her employment is pretext for discrimination. Thus, her retaliation claim still fails.

Defendants articulated several legitimate, nondiscriminatory reasons for terminating Plaintiff's employment.  In her memorandum recommending Plaintiff's termination, Nickerson noted that Plaintiff "demonstrated an inability to effectively supervise and lead her staff."  (Doc. No. 33-4, Ex. 1.)  Nickerson noted that in meetings with staff, she received feedback that Plaintiff was "demeaning to subordinates" and "did not respect her direct reports or value their input on decisions that are made in the office." (*Id.*)  Nickerson also described the expectations of the Staff Manager position and averred that Plaintiff had not met those expectations.  (*Id.*)  According to Nickerson, she attempted to "verbally coach [Plaintiff] and adjust her manner of communication and interactions with certain staff," but Plaintiff did "not appear responsive to those efforts."  (*Id.*)

Thus, having articulated a legitimate, nondiscriminatory reason for Plaintiff's termination, the burden shifts back to Plaintiff to demonstrate that Defendants' proffered reason is pretextual.  A plaintiff may establish pretext by showing the defendant's reason for termination: (1) lacked a basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse employment action.  *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012).  To show pretext, Plaintiff must show "more than a dispute over the facts upon which the

21

discharge was based." *Abdulnour v. Campbell Soup Supply Co.*, 502 F.3d 496, 502 (6th Cir. 2007) (quoting *Braithwaite v. The Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001)).  She must show "sufficient evidence from which the jury could reasonably reject [Defendants'] explanation and infer that [Defendants] intentionally discriminated against [her]." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993).

Plaintiff has made no argument in opposition to Defendants' Motion and has thus made no argument regarding pretext.  Plaintiff has offered no evidence whatsoever to demonstrate that Defendants' reasons either lacked a basis in fact, did not actually motivate their decision to terminate her, or were insufficient to warrant the adverse action.

Accordingly, the Court concludes that Plaintiff fails to establish that Defendants' proffered reasons for her termination were pretextual.  Defendants are entitled to summary judgment in their favor with respect to the retaliation claim set forth in Count IV of the Complaint.

## V.    Conclusion

For all the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 33) is GRANTED.


**IT IS SO ORDERED.**


                                                                     *s/Pamela A. Barker*
                                                                     PAMELA A. BARKER
Date: February 2, 2023                          U. S. DISTRICT JUDGE